**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **RURAL ROOTS LOUISIANA**, **MOUNT TRIUMPH BAPTIST CHURCH**, and **HARRY JOSEPH, SR.**, | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Civil Action No. 1:26-cv-1141-AHA |
| **LT. GEN. WILLIAM H. GRAHAM, JR.**, in his official capacity as Commanding General of the United States Army Corps of Engineers, and **UNITED STATES ARMY CORPS OF ENGINEERS** | ) ) ) ) ) ) ) | |
| *Defendant*s. | ) ) ) ) | |

**MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ 1

INTRODUCTION ............................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND ................................................... 2

STATEMENT OF FACTS ................................................................................................. 6

STANDARD OF REVIEW .............................................................................................. 12

ARGUMENT ................................................................................................................... 14

    I.    Plaintiffs are likely to succeed on the merits of their claims ........................................... 14

        A.    Plaintiffs are likely to succeed on their NHPA claims ................................................ 14

            1.    The Corps failed to consult with Plaintiffs. ............................................................... 14

            2.    The Corps failed to make a "reasonable and good faith effort" to identify unmarked cemeteries within the Area of Potential Effects. ............................................................... 19

            3.    The Corps failed to investigate whether the demolition of the Elise Schoolhouse constituted an anticipatory demolition. ............................................................................... 23

        B.    Plaintiffs are likely to succeed on their claims under the Thirteenth Amendment ....... 27

    II.    Plaintiffs are likely to suffer irreparable harm in the absence of relief ........................... 29

        A.    The Corps' issuance of the Permit in violation of the requirements of the NHPA violates Plaintiffs' constitutional rights under the Thirteenth Amendment ......................... 30

        B.    The Permit authorizes ground-disturbing activities that will disturb or destroy any unmarked burials. ................................................................................................................ 33

            1.    The Permit authorizes significant construction activities throughout the entire permit area ................................................................................................................................. 34

            2.    Previous work was limited but is now fully authorized ............................................. 37

            3.    Harm is imminent and irreparable .......................................................................... 39

        C.    Plaintiffs have no other form of remediation ................................................................ 40

    III.    The balance of equities and the public interest favor granting preliminary injunction. 40

    IV.    The Court should waive the bond or set a nominal bond of $1.00. ................................ 42

CONCLUSION ................................................................................................................ 44

## TABLE OF AUTHORITIES

**Cases**

*Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14 (D.D.C. 2025) .................................................. 43

*Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) ........................................................................................................................ 22

*Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284 (D.D.C. 2020)............................. 29

*\*Civil Rights Cases,* 109 U.S. 3 (1883) ................................................................................. 2, 27

*Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425 (C.D. Cal. 1985) ........................... 19

*\*Comanche Nation v. United States*, No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ............................................................................................................................ 16, 27

*Comm. to Save Cleveland's Huletts v. USACE*, 163 F. Supp. 2d 776 (N.D. Ohio 2001) ............. 19

*CREW v. U.S. DOJ*, No. CV 25-4426 (CKK), 2026 WL 472589 (D.D.C. Feb. 19, 2026) ......... 43

*Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020)............................... 18

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832 (S.D. Ohio 2020)......... 22

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999................................................... 12, 43

*Federated Indians of Graton Rancheria v. Haaland*, 762 F. Supp. 3d 888 (N.D. Cal. 2025) ..... 30

*Female Union Band Ass'n v. Unknown Heirs at Law*, 403 F. Supp. 540 (D.D.C. 1975) ............. 40

*Fund for Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998).................................................... 42

*Grand Canyon Air Tour Coal. v. F.A.A.*, 154 F.3d 455 (D.C. Cir. 1998) .................................. 18

*\*Home Box Off., Inc. v. F.C.C.,* 567 F.2d 9 (D.C. Cir. 1977) ................................................... 16

*Inclusive Louisiana v. St. James Parish*, No. 23-987, 2026 WL 352793 (E.D. La. Feb. 9, 2026)28

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983).................... 17

*League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755 (9th Cir. 2014).................................................................................................................... 41

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ......................................................... 13

*Loper Bright*, 603 U.S. at 392........................................................................................................ 15

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)................................... 18

*Mills v. D.C.*, 571 F.3d 1304 (D.C. Cir. 2009) ...................................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) 13, 33

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290 (D.D.C. 2025) ............. 13, 43

*Nation v. United States*, No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) .. 16

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025)...... 43

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.,* CV 25-4316 (RJL), 2026 WL 877779 (D.D.C. Mar. 31, 2026)................................................................................................................... 40

*Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................................................................................................................................... 42

*NRDC v. Morton*, 337 F. Supp. 167 (D.D.C. 1971)................................................................. 43

*Pillai v. C. A. B.*, 485 F.2d 1018 (D.C. Cir. 1973).................................................................. 16

*Pueblo of Sandia v. United States*, 50 F.3d 856, 861 (10th Cir. 1995)................................... 20, 26

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) ................................................................................................................ 41

*S. Utah Wilderness All. v. Norton*, 326 F. Supp. 2d 102 (D.D.C. 2004) ................................... 18

*Sayler Park Vill. Council v. USACE*, No. C-1-02-832, 2002 WL 32191511 (S.D. Ohio Dec. 30, 2002) ................................................................................................................................. 19

*_Se. Fisheries Ass'n, Inc. v. Lutnick_, No. CV 26-1533 (RC), 2026 WL 1430499 (D.D.C. May 21, 2026) ............................................................................................................ 39, 43

_The Descendants Project v. St. John the Baptist Parish, 40th Judicial District Court,_ Case No. C-77305............................................................................................................................. 7

_United States v. Jenkins_, 714 F. Supp. 2d 1213 (S.D. Ga. 2008) ...................................... 40

_Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n_, 390 U.S. 261 (1968)............... 14

_W. Watersheds Project v. Bernhardt_, 468 F. Supp. 3d 29 (D.D.C. 2020) .................................. 39

_Wis. Gas Co. v. FERC_, 758 F.2d 669 (D.C. Cir. 1985) ................................................................ 39

## Statutes

1724 Code Noir, Art. XVI ...................................................................................................... 31

1806 Black Code of Louisiana, § 12 (June 7, 1806)...................................................................... 31

33 U.S.C. § 1344 ....................................................................................................................... 6

33 U.S.C. § 408 ......................................................................................................................... 6

5 U.S.C. § 706 ......................................................................................................................... 13

54 U.S.C § 304101 .................................................................................................................... 3

*54 U.S.C. § 306108 .................................................................................................................. 3

54 U.S.C. § 306113 ......................................................................................................... 6, 23, 26

## Other Authorities

Charisse Gibson, _Who Benefits from the petrochemical industry in St. James Parish?_ WWL TV CBS (Feb. 14, 2020) ................................................................................................ 20

*Policy Statement on Burial Sites, Human Remains, and Funerary Objects, Advisory Council on Historic Preservation, March 1, 2023 ......................................................................... 4, 5, 32

*Policy Statement Regarding Burial Sites, Human Remains, and Funerary Objects: Explanations and Discussion ....................................................................................................... 29

W.E.B. Du Bois, _Black Reconstruction in America, 1860-1880_ 453 (Free Press 1935)................ 7

## Rules

Fed. R. Civ. P. 65(c) ...................................................................................................... 12, 42, 43

**INTRODUCTION**

Plaintiffs Rural Roots Louisiana, Mount Triumph Baptist Church, and Pastor Harry Joseph ask this Court to issue a preliminary injunction requiring Defendants, the United States Army Corps of Engineers (the "Corps") and Lt. Gen. William H. Graham, Jr. to (1) suspend the final permit issued to CF Industries ("CFI") for its Blue Point ammonia plant and (2) rescind the March 19, 2026 Final Effects Determination of No Adverse Effects until a hearing may be heard on the merits. This preliminary relief is necessary to temporarily preserve the status quo pending resolution of litigation on the merits of Plaintiffs' claims. Final Permit MVN-2023-00269-CF, Ex. 1 ("Permit").

The Corps issued the final Permit on July 14, 2026, along with a memorandum explaining the basis of the Corps' decision.  Memorandum for Record, Ex. 2 ("Statement of Basis"). The Permit has the effect of authorizing the construction of an ammonia manufacturing facility on the site of a former plantation in an area known for the extensive use of enslaved labor, and the unmarked cemeteries where enslaved people were buried. The facility would include a marine terminal, a pipe rack, and a heavy haul road crossing over the levee. Permit at 1. The Corps premised final approval of this permit in part upon the Corps' determination, without required consultation with Plaintiff Rural Roots Louisiana, that the undertaking would have no adverse effects on any historic properties in the project area. The Corps has also declined to investigate whether the demolition of the Elise Reuss Memorial Schoolhouse ("Elise Schoolhouse"), which was a historic property demolished during the course of the sale of the land to CFI, constituted an "anticipatory demolition" under the National Historic Preservation Act ("NHPA") that would ordinarily forbid the Corps from issuing this permit.

1

Defendants' issuance of the permit allows CFI to proceed with extensive ground-disturbing activities in the 944-acre permit area which could disturb or permanently destroy gravesites of people who were enslaved on the plantation. A preliminary injunction is necessary to prevent irreparable harm to Plaintiffs' constitutional and legal rights and interests in the protection and preservation of graves of enslaved people known to exist in the area, pursuant to the Thirteenth Amendment to the United States Constitution and the NHPA.

## CONSTITUTIONAL BACKGROUND

The Thirteenth Amendment was ratified in 1865, shortly after the end of the Civil War. As the Supreme Court recognized in its landmark 1883 Civil Rights Cases, the Amendment did not simply abolish slavery but also provided the means for abolishing all of its "badges and incidents," those burdens and incapacities that are "the inseparable incidents of the institution." *Civil Rights Cases,* 109 U.S. 3, 20, 22 (1883); *id.* at 35 ("That there are burdens and disabilities which constitute badges of slavery and servitude," and that the Thirteenth Amendment stands for the "eradication, not simply of the institution, but of its badges and incidents, are propositions which ought to be deemed indisputable."). As the physical, enduring remainder of slavery itself and the resting places of people who suffered immeasurably in that system, unmarked gravesites, and the mistreatment to which they have been subjected historically, are clear and direct "badges and incidents" of slavery. *See* Civil Rights Cases, at 20.

The obligations of the Thirteenth Amendment apply to both state and private actors.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted the NHPA in 1966, with the express intent that "the historical and cultural foundations of the nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People." National Historic

Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966). Congress also established the Advisory Council on Historic Preservation ("ACHP"), which it tasked with advising agencies regarding compliance with the NHPA and granted the authority to promulgate binding regulations implementing the act. *See* 54 U.S.C §§ 304101-304102, 304108.

One of the central provisions of the NHPA is Section 106, which requires any federal agency with the authority to issue a permit or license for an undertaking[1] to evaluate the effects the undertaking may have on any historic property prior to approval. 54 U.S.C. § 306108. The goal of the Section 106 process is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a). Section 106 review must be "initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking," and must be completed prior to the approval of any undertaking. *Id.* § 800.1(c). Although agencies may authorize "nondestructive project planning activities before completing compliance with Section 106," they may do so only where "such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." *Id*.

Once an agency determines that a project could potentially affect historic properties, it must initiate the Section 106 process. 36 C.F.R. § 800.3. The agency begins by determining and documenting the area of potential effects ("APE") of the project. *Id*. § 800.4(a)(1). A project's APE is defined as the area in which the project "may directly or indirectly cause alterations in the character or use of historic properties," and the size and scope of the APE "may be different

---

[1] "Undertaking" is defined broadly and includes any "project, activity, or program . . . requiring a Federal permit, license, or approval." 54 U.S.C. § 300320; *accord* 36 C.F.R. § 800.16(y).

for different kinds of effects caused by the undertaking." *Id*. § 800.16(d). Next, the agency must

make a "reasonable and good faith effort" to identify historic properties within the APE. *Id.* §

800.4(b)(1). Finally, the agency must consider and evaluate any potential adverse effects to

historic properties. *Id.* § 800.5.

The ACHP has emphasized that "[c]onsultation is the hallmark of the Section 106

process and is foundational to inform the broader decision-making efforts by federal agencies

and state and local governments."[2] Anyone with a demonstrated interest in the undertaking may

submit a written request to the agency to be granted "consulting party" status. 36 C.F.R. §

800.2(c)(5). The ACHP's regulations make clear that an agency must establish a "plan for

involving the public in the Section 106 process" as early as possible, and identify appropriate

points for seeking public input. *Id.* § 800.3(e)–(f). The regulations also make clear that

consultation is an ongoing process that should include participation in the major steps of the 106

process and that agencies must "involve the consulting parties… in findings and determinations

made during the section 106 process." *Id.* § 800.2(a)(4). For example, in determining the scope

of its identification efforts and APE, the agency shall "[s]eek information, as appropriate, from

consulting parties, and other individuals and organizations likely to have knowledge of, or

concerns with, historic properties in the area, and identify issues relating to the undertaking's

potential effects on historic properties." *Id.* § 800.4(a)(3); *id.* § 800.4(b)(1) (stating reasonable

and good faith effort to identify historic properties "may include . . . consultation."). If the

agency determines that no historic properties will be affected, the agency must notify all

---

[2] Advisory Council on Historic Pres., *Policy Statement Regarding Burial Sites, Human Remains, and Funerary Objects: Explanations and Discussion* at 4 (Feb. 4, 2025), https://www.achp.gov/sites/default/files/2025-02/BurialPolicyExplanationandDiscussionGuidanceDocumentFeb2025.pdf.

consulting parties and provide the state, tribes, and consulting parties 30 days in which to object. *Id.* § 800.4(c)–(d). If any consulting party disagrees with the finding, the agency "shall either consult with the party to resolve the disagreement, or request the [ACHP] review the finding." *Id.* § 800.5(c)(2)(i). If the agency requests that the ACHP review the finding, the agency **must** "notify all consulting parties that such a submission has been made and make the submission documentation available to the public." *Id.*

In 2023, the ACHP issued a policy statement recognizing that burial sites, human remains, and funerary objects are of "significant social and moral consequence" regardless of whether they are deemed eligible for individual listing on the National Register of Historic Places.[3] The ACHP has also emphasized that burial sites of enslaved Africans and those of African descent in particular have added layers of risk, trauma, and significance associated with them given the legacy of slavery and the barriers to access and recognition that followed, and that as a result of the legacy of slavery they also face a "higher probability of being unmarked and undocumented and thus [are] more likely to be affected by development projects."[4] 8As such, the ACHP instructs that disturbance "should not be pursued unless there are **no other alternatives available and only after consultation with descendants** or other . . . associated . . . groups and fully considered avoidance of impact and preservation in place."[5]

Finally, Section 110(k) of the NHPA forbids an agency from issuing a permit to any applicant who either 1) intentionally and significantly adversely affected a historic property to

---

[3] Advisory Council on Historic Pres., *Policy Statement on Burial Sites, Human Remains, and Funerary Objects* 2 (Mar. 1, 2023), https://www.achp.gov/sites/default/files/policies/2023-03/PolicyStatementonBurialSitesHumanRemainsandFuneraryObjects20230301_1.pdf (hereinafter "ACHP Burial Sites Policy Statement").
[4] *Id.* at 1.
[5] *Id.* at 2.

which the grant would relate, **or** 2) having legal power to prevent it, allowed the significant

adverse effect to occur. 54 U.S.C. § 306113. This provision **requires** an agency to deny a permit

application if it finds such intentional anticipatory demolition has occurred, unless and until the

agency goes through a special consultation process with the ACHP to determine whether

circumstances justify granting the permit. *Id.*; *accord* 36 C.F.R. § 800.9(c).

## STATEMENT OF FACTS

CF Industries Blue Point Ammonia Plant

This case concerns land in Modeste, Ascension Parish, Louisiana, that was once home to

several sugarcane plantations that operated during the period of slavery. Am. Compl. ¶ 2.

Modeste is a multi-racial community of families that have lived there for generations, many of

whom are descendants of people who were enslaved and were buried on those plantations. *Id.*;

Decl. of Dr. Ryan Gray, Ex. 3 ¶¶ 4-5 ("Gray Decl."). Multiple neighboring parcels of land in

Modeste have been targeted for industrial development in coordination with the governments of

Louisiana and Ascension Parish, in a massive industrial project that the State refers to as the

"RiverPlex MegaPark." To date, the MegaPark project includes two proposed ammonia plants, a

proposed steel plant, a 3.1-gigawatt natural gas-fired power plant, and a new highway intended

to connect and serve these facilities. All of these projects require permits from the Corps.

On February 7, 2025, CFI submitted an application to the Corps for a permit that would

allow it to construct an ammonia plant, referred to as the "Blue Point Project." Am. Compl. ¶ 95.

The proposed construction will impact both wetlands and the Mississippi River and requires both

a wetlands permit (CWA Section 404, 33 U.S.C. § 1344) and Rivers and Harbors Act permit (33

U.S.C. § 408) from the Corps. *Id.* ¶ 66. The land upon which CFI intends to build this plant is the

site of the former Elise Plantation. *Id.* ¶ 107. Historic mortality records show that slavery on the

6

plantations in the River Parishes was especially brutal, and many Louisiana slaveholders "made it their policy to work the slaves to death and buy new ones instead of taking care of the old and sick."[6] Enslaved people were routinely buried in unmarked graves on the River Parish plantations, and Louisiana's former chief archaeologist, Dr. Chip McGimsey, has stated that "there is going to be a slave cemetery… with almost 100% certainty [on] every plantation that existed."[7] This is especially the case because "child mortality rates in those days was very high" and as a result Dr. McGimsey would "expect that most plantations are going to have [sic] cemetery of some size, somewhere on their property."[8]

Data from the Ascension Parish Assessor's Office indicates that the CFI Blue Point project site consists of two parcels of land—one 929.50-acre parcel that comprises most of the entire project site, Parcel 324700, and a much smaller 3.13-acre parcel, Parcel 267200 ("schoolhouse parcel").  Assessor's Office Reports on Parcels 324700 & 267200, Ex. 4.[9] The Assessor's records show that CFI purchased Parcel 324700 on September 29, 2022, Ex. 4 at 1, and Parcel 267200—the 3.13-acre schoolhouse parcel—a few months later, on February 7, 2023. *Id.* at 5. CFI purchased both parcels for $100 each. *Id.* at 1, 5. The 3.13-acre schoolhouse parcel used to be the site of the Elise Schoolhouse, a historic schoolhouse dedicated to the education of

---

[6] *See* W.E.B. Du Bois, *Black Reconstruction in America, 1860-1880* 453 (Free Press 1935).
[7] Charisse Gibson, *Who Benefits from the petrochemical industry in St. James Parish?,* WWL TV CBS (Aug. 18, 2021), https://www.wwltv.com/article/news/local/who-benefitsfrom-the-petrochemical-industry-instjames-parish/289-e41c3adb-0a11-47c4-b28e-dcfc2bc230e6.
[8] Testimony of Dr. Charles McGimsey in *The Descendants Project v. St. John the Baptist Parish, 40th Judicial District Court,* Case No. C-77305, p. 59:1-5.
[9] These records are publicly available online through Schneider Geospatial, which provides web-GIS services for the Ascension Parish Assessor's Office. *See Parcel Report 324700*, Ascension Assessor, https://beacon.schneidercorp.com/Application.aspx?AppID=1188&LayerID=35843&PageTypeID=4&PageID=13572&KeyValue=324700; *Parcel Report 267200*, Ascension Assessor, https://beacon.schneidercorp.com/Application.aspx?AppID=1188&LayerID=35843&PageTypeID=4&PageID=13572&KeyValue=267200

Black children during Jim Crow. Am. Compl. ¶ 109. However, this schoolhouse was demolished sometime in late 2022 or early 2023—several months **after** CFI had purchased Parcel 324700, and less than three months before it purchased the separate schoolhouse parcel. Elise Schoolhouse Aerial Photos, Ex. 5.

<u>The Corps' Section 106 "Consultation Process"</u>

On September 23, 2025, Plaintiff Rural Roots Louisiana, through its founder Ashley Gaignard, submitted a written request to the Corps for consulting party status for the CF Industries ammonia plant undertaking. Am. Compl. ¶ 97. On December 16, 2025, the Corps granted Rural Roots' request for consulting party status. *Id.* ¶¶ 97-98. This email advised Rural Roots that "the Section 106 consultation has not been initiated yet," and that they would receive an invitation to participate once consultation was initiated. *Id.* ¶ 98.

On March 24, 2026, Ms. Gaignard received an email again acknowledging that the Corps was inviting her/Rural Roots to be a Consulting Party to its Section 106 review of the permit application of CF Industries. *Id.* ¶ 99. However, the email included an attached letter informing Ms. Gaignard that the Corps had already made a "Final Effect Determination" of "No Adverse Effect to Historic Properties with Condition of Avoidance" for the permit. "No Adverse Effects" Final Determination with Condition, Ex. 6 ("Final Determination"). This determination was made prior to any consultation with Plaintiffs. The Final Determination stated that the APE for direct and indirect effects encompassed the entire (approximately) 944 acres of the project site. *Id.* at 1. The Final Determination acknowledged that the grounds housing the remnants of the Elise Schoolhouse were eligible for listing on the National Registry of Historic Places. *Id.* at 2. The Final Determination did not include any discussion of unmarked burial sites, aside from stating that the project would be subject to the "standard" unexpected discovery and unmarked

human burial site provisions. *Id.* at 3.[10] The email advised Ms. Gaignard that she had 30 days to provide comments on the decision. Am. Compl. ¶ 101. Around the same time in mid-to-late March 2026, CFI commenced ground-disturbing construction activities on the site, including site-grading, trenching, equipment staging (including heavy construction vehicles such as bulldozers and cranes). *Id.* ¶¶ 120-21; Exhibit 7, Declaration of Twila Collins, Ex. 7, ¶¶ 21-24, 39 ("Collins Decl."). Now that construction throughout the full site is permitted construction can begin in earnest, these activities (which already risked harm to unmarked graves) will accelerate.

On April 2, 2026, Plaintiffs commenced this action to enforce their rights under the Thirteenth Amendment and the NHPA. On April 23, 2026, Plaintiffs submitted comments on the Final No Adverse Effects Determination to preserve their administrative appeal rights. Rural Roots Comments on Final Determination, Ex. 8 These comments reiterated Plaintiffs' concerns about numerous serious deficiencies in the Corps' purported Section 106 review process. *Id.* at 4-8.[11]

On May 19, 2026, Secretary of Agriculture Brooke Rollins held a press conference where she was joined by numerous federal officials, including Defendant Graham and Assistant Secretary for the Army for Civil Works Adam Telle, who directly oversees the Army Corps.[12] Secretary Rollins announced that thanks to the efforts of Defendant Graham and Assistant

---

[10] These "standard provisions," which were included in paragraph 3 of the Conditions of Avoidance accompanying the Final Determination, require CFI to stop work and "comply with the Louisiana Unmarked Human Burial Sites Preservation Act" if remains are discovered. *Id.* at 7.

[11] Plaintiffs' comments also challenged the Corps' determination limiting the area of potential Effects to the 944-acre project site. *Id.* at 5–6. However, for purposes of this motion, Plaintiffs have limited discussion to the potential effects occurring within the 944-acre project site—which both Plaintiffs and Defendants agree is properly within the Area of Potential Effects.

[12] U.S. Dep't of Agric., *Secretary Rollins Hosts Fertilizer Press Conference,* YouTube (May 19, 2026), https://www.youtube.com/watch?v=4gnL9vPoF9k [hereinafter "Press Conference"].

Secretary Telle, the Corps was expediting the CFI permit at "Trump Speed," and that permitting for the facility would be "wrapped up" within 45 days.[13] Secretary Telle asserted that the CFI project was "mired in Green New Deal red tape" and that the Corps expected to have a decision on the project within 45 days.[14] Assistant Secretary Telle further noted that President Trump had directed agencies not to delay any fertilizer-related permits, and that he was "concerned" based on the CFI permit that this message had not penetrated "all the way down" into the Corps.[15] Assistant Secretary Telle stated that a few days prior to the Press Conference, he had issued a memorandum to all 39 Corps districts to "remind our workforce that when it comes to fertilizer, they should not be deterred by red tape," and that now that "all the ambiguity is out of the system," the CFI project ("and many others") should be online shortly.[16]

On June 3, 2026, Army Corps archaeologist Erin Powers emailed Pamela Spees to inform Plaintiffs that she was working to finalize a response to their comments on the Final Determination, that there would be an internal review, and that the Corps was aiming to provide its response by the next week. Email from Erin Powers, Ex. 9.

The Final Permit

On July 2, 2026, Plaintiffs filed a Motion for a Temporary Restraining Order, based on Secretary Rollins and Assistant Secretary Telle's Press Conference which indicated that the Corps intended to issue the CFI permit by July 3, 2026. *See* ECF No. 21. On the evening of July 2, 2026—after this Court's order directing Defendants to file a status report—the Corps sent Plaintiffs a response to their comments on the March 19, 2026 "no adverse impacts" final

---

 Press Conference, at 05:19–05:55
[14] *Id*. at 21:00–09.
[14] *Id*. at 21:00–09.
[15] *Id.* at 21:35–21:48.
[16] *Id.* at 21:51–22:03.

determination. This response stated that in "accordance with 36 C.F.R § 800.5(c)(2)(i) and [the Corps'] NHPA Section 106 Review consultation obligations," the Corps had considered Plaintiffs' objections and was "provid[ing] these responses in an effort to resolve the disagreement."   Response to Objection to Final Determination, Ex. 10 ("Response").

The Response rejected all of Plaintiffs' comments and asserted that the Corps had satisfied its consulting obligation under Section 106 of the NHPA because it "clearly asked for comments from consulting parties [on the Final Determination]." Response at 2. Neither the Response nor the email made any mention of a follow-up discussion or additional consultation to resolve the disagreement, and neither indicated that the Corps had requested that the ACHP review the finding as required by 36 C.F.R. § 800.4(c)(2)(i). Also on the evening of July 3, 2026, the Corps finalized its Environmental Assessment and Statement of Findings for the permit. Statement of Basis at 44.

On July 15, 2026, Plaintiffs discovered through a chance review of the Corps' online permit database[17] that the Corps had apparently issued CFI its final permit "with special conditions" on July 14, 2026. Plaintiffs requested a copy of the permit through Defendants' counsel on July 15 and Defense counsel provided the permit and statement of basis on July 16.[18] *See* Permit; Statement of Basis. The Permit was signed by CFI's representative on July 8, indicating that the Corps sent a final permit to CFI sometime between July 3 and 8. Permit at 3.

The Permit authorizes CFI to "[c]lear, grade, and deposit fill and dredge Mississippi River waterbottoms for the construction of an ammonia manufacturing facility including a

---

[17] US Army Corps of Eng'r, *USACE Regulatory and Section 408 Publicly Available Data*, https://permits.ops.usace.army.mil/orm-public.
[18] To date, the Corps has not provided Plaintiffs or (as far as Plaintiffs are aware) any other consulting parties with notice of this permit decision.

marine terminal, pipe rack, and heavy haul road." Permit at 1. General Condition 3 requires CFI

to notify the Corps' New Orleans District in the event that CFI discovers any previously

unknown historic or archeological remains while accomplishing the activity authorized by the

Permit. *Id.* In the event that "abandoned cemeteries, unmarked graves, or human remains are

discovered during the permitted activity," Special Condition 8 directs CFI to "stop work

immediately and comply with the Louisiana Unmarked Human Burial Sites Preservation Act"

and notify the relevant authorities. *Id.* at 4.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 65

Federal Rule of Civil Procedure 65 authorizes a court to issue preliminary injunctions,

which are generally a "stopgap measure" meant to "preserve the relative positions of the parties"

until a trial on the merits can be held. *Sherley v. Sebelius*, 689 F.3d 776, 781–782 (D.C. Cir.

2012) (quotation omitted). A movant seeking a preliminary injunction must demonstrate that: (1)

that they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the

absence of the requested relief; (3) the balance of equities tips in their favor; and (4) that the

public interest favors entry of a temporary restraining order. *Winter v. Nat. Res. Def. Council*,

555 U.S. 7, 20 (2008). When the movant is seeking to enjoin the Government, the final two

factors (equities, public interest) merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Fed. R. Civ. P. 65(c) generally requires a movant to pay security in the amount that the

court considers proper. Rule 65(c) "vest[s] broad discretion in the district court" in setting the

amount of such bond, and this includes the discretion to set it at a nominal amount. *DSE, Inc. v.*

*U.S.*, 169 F.3d 21, 33 (D.C. Cir. 1999). Courts in this Circuit have routinely either waived the

requirement for a bond in public interest cases against the Government or required only a

12

nominal bond, because imposing a significant bond in public interest litigation would tend to frustrate the goals of judicial review. *See, e.g.*, *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (courts have frequently declined to require bonds in public interest litigation because imposing a bond runs the risk of "unduly burden[ing] Plaintiffs and potentially impair[ing] their ability to seek judicial relief.").

Administrative Procedure Act

The Administrative Procedure Act states that a reviewing court "shall hold unlawful and set aside agency action, findings and conclusions of law" that are: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or adopted without observance of procedure required by law. 5 U.S.C. § 706(2)(A)–(B), (D). At bare minimum, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted).

The APA further "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 392 (2024) (quoting 5 U.S.C. § 706); *see also*

13

*Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n*, 390 U.S. 261, 272 (1968)

(establishing that courts have final say over all questions of law under § 706 and cannot "rubber

stamp" agency decisions that are "inconsistent with a statutory mandate or that frustrate the

congressional policy underlying a statute" (internal citations omitted)).

**ARGUMENT**

I.    **Plaintiffs are likely to succeed on the merits of their claims**

    A.    <u>Plaintiffs are likely to succeed on their NHPA claims</u>

Plaintiffs are likely to succeed on their NHPA claims because the Corps' issuance of the

Permit fails to meet the basic requirements of the NHPA in at least three significant ways. First,

the Corps failed to consult with Plaintiffs, as required under Section 106 of the NHPA. Second,

the Corps failed to make a "reasonable and good faith effort" to identify potential unmarked

cemeteries within the undertaking's Area of Potential Effects. 36 C.F.R. § 800.4(b)(1). And

finally, the Corps failed to meaningfully investigate whether the conditions surrounding the

demolition of the Elise Schoolhouse in 2023 constituted an "anticipatory demolition" in violation

of the NHPA as part of its review of the permit application.

    1.    *The Corps failed to consult with Plaintiffs.*

The Corps' failure to consult with Plaintiffs and others in the descendant community

prior to approving the Permit constitutes a violation of the NHPA. From start to finish the Corps

has done little more than pay lip service to its mandatory consultation obligations, as it

circumvents the Section 106 process in its rush to issue this permit in accordance with, according

to Assistant Secretary Telle, President Trump's directive not to delay any fertilizer-related

14

permits. Press Conference, *supra* n. 13.[19] The Corps' Response to Comments states the Corps'

position that it has satisfied its consulting obligation under Section 106 of the NHPA because it

"clearly asked for comments from consulting parties [on the Final Determination]." Response at

2. Allowing Plaintiffs to comment on a final determination only after the Corps has made up its

mind and without any communication with Plaintiffs, much less meaningful consultation, does

not satisfy the requirements of the NHPA, and the Corps' interpretation of its obligation under

Section 106 is plainly untenable.

This Court owes no deference to the Corps' interpretation of Section 106. *See Loper*

*Bright Enter.*, 603 U.S. at 392. This is especially the case here where the Corps' reading of

Section 106 is not even a reasonable reading of the statute, let alone the "best" reading. The

ACHP's regulations make clear that consultation is an ongoing process that should include

opportunities to participate in the 106 process **from start to finish,** and that agencies must

"**involve** the consulting parties . . . in findings and determinations made during the section 106

process." 36 C.F.R. § 800.2(a)(4) (emphasis added). The ACHP's regulations clearly

contemplate that agencies should plan to involve the public and consulting parties as early as

possible, *id.* § 800.3(e)–(f), and that agencies should involve consulting parties in the scoping

decisions that are prerequisites to a final determination, such as determining the appropriate

scope of the APE and the identification of potential historic properties. *See Comanche Nation v.*

---

[20] The Corps' failure here is not an isolated incident but reflects an apparent pattern of disregard for the requirements of the NHPA. As laid out Plaintiffs' Amended Complaint, Rural Roots Louisiana also requested consulting party status for the other components of the RiverPlex MegaPark. Two, the Clean Hydrogen Works ammonia plant and the Energy Transition Parkway ("ETP"), are also before this Court. Am. Compl. ¶¶ 82-94. As with CFI, though the Corps granted RRL's request for the ETP, it never actually consulted before issuing a final determination of "no adverse effects." *Id.* ¶¶ 85-86. The Corps did not even respond to RRL's request before issuing the Clean Hydrogen Works permit. *Id.* ¶¶ 90-92.

15

*U.S.*, No. CIV-08-849-D, 2008 WL 4426621, at \*4 (W.D. Okla. Sept. 23, 2008) (agencies are "required to consult with interested parties . . . in the identification of potential affected historic properties," and to seek information from individuals "likely to have knowledge of, or concerns with, historic properties in the area and identify issues relating to the undertaking's potential effects on historic properties") (citing 36 C.F.R. § 800.4(a)(2)-(3)).

The regulations further state that in *applying* the criteria of adverse effect to historic properties within the APE, the agency "shall consider any views concerning such effects which have been provided by consulting parties and the public." 36 C.F.R. § 800.5(a). These provisions plainly contemplate that the views of consulting parties shall be taken into account **before** an agency proposes a finding of no adverse effect. *Accord Comanche Nation*, 2008 WL 4426621, at \*5(stating an agency may make a finding of no adverse effect "*after* applying [the criteria] and other considerations") (emphasis added).

Soliciting the views of consulting parties only once the agency has already made all of the relevant scoping and eligibility determinations that pre-determine the substance of the proposal is meaningless and runs contrary to the entire purpose of ensuring that the Section 106 process "is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." 36 C.F.R. § 800.1(c). In reviewing agency action under the APA, the D.C. Circuit has frequently found the "artificial narrowing of options to be arbitrary and capricious" and "an abuse of discretion." *Pillai v. C. A. B.*, 485 F.2d 1018, 1027 (D.C. Cir. 1973) (striking down agency decision where "the very nature of the [agency's] rationale for its action reveals that it conceived of approval… as the only available alternative"). The D.C. Circuit in *Home Box Off., Inc. v. F.C.C.,* 567 F.2d 9 (D.C. Cir. 1977), for example, vacated a Federal Communications Commission rule intended to prevent

16

"siphoning," the bidding away of popular programs from free broadcast to paid cable, because it presupposed siphoning was harmful and that a rule was necessary to prevent it, noting that:

> To state the problem this way, however, is to gloss over the fact that the Commission has in no way justified its position . . . Such an artificial narrowing of the scope of the regulatory problem is itself arbitrary and capricious and is ground for reversal . . . As a result, informed criticism has been precluded and formulation of alternatives stymied.

*Id.* at 36; *see also Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816 (D.C. Cir. 1983) (vacating rule where record showed Secretary had failed to provide an explanation for his implicit rejection of alternatives; "such an 'artificial narrowing of options' . . . is antithetical to reasoned decisionmaking and cannot be upheld") (quoting *Pillai*, 485 F.2d at 1027).

Even if Defendants believed a single opportunity to provide written comments on the Final Determination could satisfy the consultation requirements of Section 106 (it does not), they have failed to even comply with their own self-selected minimal requirements. The Corps provided Plaintiffs with a response to Plaintiffs' comments only after Plaintiffs sought a temporary restraining order. While this Response stated that Defendants were "provid[ing] these responses in an effort to resolve the disagreement," the Corps summarily rejected all of Plaintiffs comments and asserted that it had completed its consulting obligation because it had "asked for comments from consulting parties [on the Final Determination]." Response at 2. The Corps made no effort to discuss Rural Roots' objections any further, and 12 days later, the Corps approved the final Permit. The Permit was signed by CFI's representative on July 8, indicating the Corps sent the Permit to CFI less than three business days after its Response to Plaintiffs' comments.

The Corps' issuance of the Permit without any further consultation violates 36 C.F.R. § 800.5(c)(2)(i), which explicitly states that if any consulting party objects to the finding, "the agency official must 'consult with the party to resolve the disagreement, or request the [ACHP]

17

to review the finding.'" *S. Utah Wilderness All. v. Norton*, 326 F. Supp. 2d 102, 109 (D.D.C. 2004) (quoting 36 C.F.R. § 800.5(c)(2)(i)). If the agency opts to request the ACHP's review (in lieu of further consultation with the consulting party), the agency must "notify all consulting parties that such a submission has been made and make the submission documentation available to the public." 36 C.F.R. § 800.5(c)(2)(i). The Corps has neither consulted with Plaintiffs, nor indicated that it has requested the ACHP's review of the finding.

Under the APA, "[a]n agency is required to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them." *Grand Canyon Air Tour Coal. v. F.A.A.*, 154 F.3d 455, 468 (D.C. Cir. 1998). "An agency must also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant." *Id.* Evidence that an agency has effectively prejudged an outcome or is not open to making meaningful changes in response to comments, is evidence of arbitrary and capricious decision-making. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) (holding EPA violated APA's notice and comment procedures because evidence in the record suggested "too closed a mind."); *Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 86–87 (D.D.C. 2020) (finding agency failed to provide meaningful opportunity to comment where it conceded that the decision to list a species as threatened was made prior to the opening of the final comment period).

The issuance of the Permit a mere 12 days after the Corps' response to comments without any consultation prior to the agency's final decision or any attempt to resolve Plaintiffs' objections (as required by law), in conjunction with the numerous statements by Assistant Secretary Telle (while the Corps was purportedly considering their comments) inveighing against "red tape" holding up the permit and directing the Corps to expedite this permit, strongly

18

suggests that the decision to issue the permit had already been made, and that the "opportunity to comment" on the Final Determination was never anything more than a sham. The NHPA is the *law*, not merely "red tape" that Defendants may disregard should it inconvenience them.[20]

> ### 2. *The Corps failed to make a "reasonable and good faith effort" to identify unmarked cemeteries within the Area of Potential Effects.*

The NHPA requires agencies to make a "reasonable and good faith effort" to identify historic properties within the APE. 36 C.F.R. § 800.4(b)(1). Such efforts "may include background research, consultation, oral history interviews, sample field investigation, and field survey," and the agency shall also "take into account . . . the likely nature and location of historic properties within the area of potential effects." *Id.* The Corps has failed to make a "reasonable and good faith effort" to identify any unmarked cemeteries within the project's Area of Potential Effects. As the Corps determined, the entire 944-acre project area is properly considered the "permit area"[21] within the scope of the Corps' jurisdiction for Section 106 review, because it includes both those areas comprising "waters of the United States that will be directly affected

---

[20] The Corps' failure here is not an isolated incident but reflects an apparent pattern of disregard for the requirements of the NHPA. As laid out Plaintiffs' Amended Complaint, Rural Roots Louisiana also requested consulting party status for the other components of the RiverPlex MegaPark. Two, the Clean Hydrogen Works ammonia plant and the Energy Transition Parkway ("ETP"), are also before this Court. Am. Compl. ¶¶ 82-94. As with CFI, though the Corps granted RRL's request for the ETP, it never actually consulted before issuing a final determination of "no adverse effects." *Id.* ¶¶ 85-86. The Corps did not even respond to RRL's request before issuing the Clean Hydrogen Works permit. *Id.* ¶¶ 90-92.

[21] The Corps' definition of "permit area" is narrower than the ACHP's definition of "area of potential effects" as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. § 800.16(d). Multiple district courts have noted this discrepancy and held that the ACHP's regulations (not the Corps') govern NHPA compliance. *See, e.g.*, *Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1437 (C.D. Cal. 1985); *Comm. to Save Cleveland's Huletts v. USACE*, 163 F. Supp. 2d 776, 792 (N.D. Ohio 2001); *Sayler Park Vill. Council v. USACE*, No. C-1-02-832, 2002 WL 32191511, at *8 (S.D. Ohio Dec. 30, 2002). Under either definition, the APE for this project properly encompasses the entire 944-acre project site (at minimum).

19

by the proposed work or structures, as well as activities outside of waters of the U.S." that meet all three of the Corps' tests for jurisdiction identified in its Section 106 regulations. Ex. 2 at 3 (citing 33 C.F.R. 325, App. C(g)(1)); *see also* No Adverse Effect Determination at 1 ("The APE for direct and indirect effects is approximately 944 acres").

Determining what constitutes a reasonable effort to identify traditional cultural properties "depends in part on the likelihood that such properties may be present." *Pueblo of Sandia v. United States*, 50 F.3d 856, 861 (10th Cir. 1995). The land in question is the site of the former Elise Plantation. Am. Compl. ¶ 107. As Louisiana's former chief archaeologist, Dr. Chip McGimsey, has stated, "there is going to be a slave cemetery… with almost 100% certainty [on] every plantation that existed"[22] in the River Parishes. Dr. Ryan Gray, an archaeologist specializing in the historical archaeology of southeastern Louisiana, further notes that given this specific context, "any cultural resource investigation of lands occupied by a historic plantation [in the River Parishes] should make the locating of cemeteries a primary concern of the investigation." Gray Decl. ¶ 4. In the 2023 cultural resources survey that TerraXplorations, Inc. ("TerraX") performed for CFI, the TerraX investigators acknowledged the history of slavery on the site and that "[e]nslaved peoples likely laid to rest their loved ones within the marginal lands" on the property.47F Exhibit 11,[23] "TerraX Report," at 9. In spite of this, the TerraX investigators limited their investigation to a 3.2-acre area of potential effects around the former Elise Schoolhouse, which is a tiny fraction of the project's actual 944-acre area of potential effects. TerraX further limited their search for burial sites to a review of "historic aerial imagery and

---

[22] Charisse Gibson, *Who Benefits from the petrochemical industry in St. James Parish?,* WWL TV CBS (Feb. 14, 2020), https://www.wwltv.com/article/news/local/who-benefitsfrom-the-petrochemical-industry-instjames-parish/289-e41c3adb-0a11-47c4-b28e-dcfc2bc230e6.

[23] Steven J. Filoromo, Margaret Schultz & Cristyn Maxey, *A Phase 1 Cultural Resources Survey of the Elise Schoolhouse in Ascension Parish, LA*, TerraXplorations, Inc. (Oct. 2023). Ex. 11.

maps of the project area and batture" and shovel truthing. TerraX Report at 9, 30. Based on this narrow review of the 3.2-acre area around the former Schoolhouse, the report concluded that "there are no locations that might potentially indicate the presence of an unmarked cemetery."

The Corps' final determination of "no adverse impacts" relied on both the fundamentally flawed 2023 TerraX survey, as well as a cultural resources survey of the land performed by Surveys Unlimited Research Associates ("SURA") in 2018 as part of the Louisiana Economic Development Site Certification Program.[24] Dr. Gray reviewed both reports, and concluded that both contained significant deficiencies and that "the potential for unmarked burials… remains unresolved." Gray Decl. ¶ 14. Dr. Gray notes that the SURA Report, for example, did not use any industry-accepted methods for detecting unmarked cemeteries. *Id.* ¶ 8-11. In fact, Dr. Gray found that the SURA Report hardly mentions the potential for unmarked burials and makes minimal use of historic documents, including maps and aerial surveys, because it treated the presence of burials as a secondary possibility—which is incompatible with the known history of the site. *Id.* ¶ 12. Dr. Gray noted that the TerraX survey had been limited to the approximately three-acre area around the former Elise Schoolhouse, "one of the lower probability areas for the occurrence of such sites," and also did not follow up with ground penetrating radar, magnetometry, landscape modeling or oral histories, which are industry-accepted standards for locating burial sites that are known to be part of the history of the site. *Id.* at ¶ 7.

Plaintiffs identified these serious concerns in their April 23, 2026, comments on the "no adverse impacts" Final Determination. The Corps summarily rejected these comments, on the grounds that the SURA Report had conducted shovel testing at 30-meter intervals in accordance

---

[24] Brandy Kerr, Jennie Garcia & Malcolm Shuman, *Phase 1 Cultural Resources Survey of 944 Acres (382 Hectares) near Donaldsonville, Ascension Parish, Louisiana: Final Report*, 17 Surveys Unlimited Research Associates, Inc. (SURA) (Nov. 2018) ("SURA Report"). Ex. 12.

21

with Louisiana State Historic Preservation Officer survey standards, and that TerraX had conducted shovel testing at 30-meter intervals and 10-meter intervals in the area around the Elise Schoolhouse. Ex. 10, Response at 2-3. The Corps also stated that both SURA and TerraX "investigated and reported their findings in accordance with Louisiana Division of Archaeology (LDOA) field and reporting standards." *Id.* at 3. The Corps concluded that because these surveys "complied with professional standards and were sufficient and appropriate to the needs for the proposed project, [the Corps'] declines to request that CF Industries engage in further survey work[.]" *Id.* at 3. The Corps' response is woefully inadequate for several reasons.

First, the Corps' response does *not* address the concerns raised by Plaintiffs—that both surveys fell far below industry-accepted standards for locating burial sites as a matter of primary concern, and that the TerraX survey performed for CFI limited its survey to the tiny area around the former Elise Schoolhouse—an area of low probability for unmarked burials. Second, while the Corps states the shovel truthing portion of the surveys "complied with professional standards," the Corps cannot rely on the fact that one activity conducted as part of the surveys met another organization's certification standards as a replacement for its independent review of whether those efforts are reasonable under the NHPA. *Accord Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971) (agency rule stating proof licensee would observe standards set by other agencies sufficed to show no adverse environmental impact for purposes of NEPA review was "in fundamental conflict with the basic purpose of the Act"); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 858 (S.D. Ohio 2020) (Forest Service failed to take the "hard look" required under NEPA and did not engage in reasoned analysis where it did not conduct its own review but instead relied primarily on another agency's letter, which lacked support for its conclusions). The Corps' reliance on

22

these other standards is especially inappropriate because the Corps neither explains what these standards are nor provides a copy, and Plaintiffs were unable to locate a copy of them online.

Considering the sensitivity and cultural and religious significance of the burial sites known to exist on these properties, this methodology falls far short of industry-accepted practices for locating unmarked burial sites and the "reasonable and good faith effort" required by Section 106 of the NHPA.

3. *The Corps failed to investigate whether the demolition of the Elise Schoolhouse constituted an anticipatory demolition*

Finally, the Corps failed to investigate whether the conditions surrounding the demolition of the Elise Schoolhouse in late 2022 or early 2023 constituted an "anticipatory demolition" in violation of the NHPA as part of its review of the permit application.

Section 110(k) forbids an agency from issuing a permit to any applicant that either intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, allowed the significant adverse effect to occur. 54 U.S.C. § 306113. An agency must deny a permit application if it finds such intentional anticipatory demolition has occurred, unless and until the agency goes through a special consultation process with the ACHP to determine whether circumstances justify granting the permit. *Id.*

As noted above, records from the Ascension Parish Assessor's Office show CFI purchased the land in question in two separate purchases. CFI first purchased Parcel 324700, which covers roughly 99% of the entire project site, on September 29, 2022.[25] CFI purchased Parcel 267200, which includes the 3.13 acres holding the site of the former Elise Schoolhouse,

---

[25]
https://beacon.schneidercorp.com/Application.aspx?AppID=1188&LayerID=35843&PageTypeID=4&PageID=13572&KeyValue=324700

on February 7, 2023.[26] A review of commercially available, ultra high-resolution ($\leq$ 15 cm

resolution) aerial imagery of the CFI site shows the Elise Schoolhouse was still standing on

September 29, 2022, when the larger parcel was bought by CFI Blue Point. The most recent ultra

high-resolution imagery showing the schoolhouse still standing is from November 30–December

1, 2022. Figure 1 below; *see also* Ex. 5 at 1-2.[27] The next date range with imagery of comparable

resolution (January 13–14, 2023) shows the schoolhouse demolished. Figure 2 below; *see also*

Ex. 5 at 3-4.

**Figure 1** Zoomed-in ultra-high resolution aerial imagery from November 30–December 1, 2022,
showing Elise Schoolhouse still standing. Imagery from Vexcel (2022) via SkyWatch.



---

[26]

https://beacon.schneidercorp.com/Application.aspx?AppID=1188&LayerID=35843&PageTypeID=4&PageID=13572&KeyValue=267200

[27] Because the aerial imaging campaign occurred over multiple days, a date range as opposed to
a single date is provided by the imagery vendor.

**Figure 2** Zoomed-in ultra-high resolution aerial imagery from January 13–14, 2023, showing Elise Schoolhouse demolished. Imagery from Nearmap (2023) via SkyWatch.



These aerial images show the Elise Schoolhouse was demolished sometime between November 30, 2022, and January 13–14, 2023—at least two months *after* CFI had purchased Parcel 324700, and immediately *before* it purchased the schoolhouse parcel. The 2023 TerraX Report states that "the schoolhouse was still standing until early 2023" but that the "former landowner or relative (a Hayward) destroyed the schoolhouse in hopes to sale [sic] the property with greater ease." TerraX Rep. at 14. TerraX does not mention that both parcels of land were sold to CFI for a nominal amount of $100 each. Ex. 4 at 1, 5.

In their comments on the Final Determination, Plaintiffs highlighted the destruction of the Schoolhouse that occurred immediately prior to the sale of the land to CFI, and requested that the Corps' investigate the circumstances of the Schoolhouse's demolition and whether it constituted an "anticipatory demolition" under Section 110(k) of the NHPA. Comments at 3-4. The Corps summarily dismissed Plaintiffs' concern, and stated in response that:

25

> At this time, based upon the best available information provided to [the Corps], which indicates that any demolition that has occurred was not undertaken by or at the direction of CF Industries, [the Corps] has determined that an investigation into potential anticipatory demolition under NHPA Sec.110(k) is not warranted.

Response at 2.

The Corps response is not sufficient. First, the Corps provides no information at all regarding what "best available information" the Corps relied on to reach its decision. Second, the Corps' decision that an investigation is not warranted under these circumstances beggars belief. CFI cannot have been unaware of the Schoolhouse's likely eligibility for the National Register, given that the 2018 SURA Report—which TerraX and CFI relied upon—had expressly identified the schoolhouse as likely meeting the criteria for inclusion in the Register and recommended "further evaluation of the historic properties associated with the Elise Schoolhouse prior to ground disturbing activities to determine eligibility for inclusion to the NRHP." Ex. 12 at i. And there is no apparent explanation for why CFI purchased all but the small parcel of land where the former schoolhouse was located first and then purchased the small parcel shortly after the former schoolhouse was demolished. These circumstances are more than sufficient to raise a substantial concern that the schoolhouse was demolished prior to sale to avoid Section 106 review, and warrant investigation by the Corps, in consultation with the ACHP. These are all discrepancies that the Corps could have easily uncovered, had it done even a minimal review of the circumstances surrounding the demolition—and the fact that Defendants do not address them at all but merely state they found "no reason to investigate," falls short of the legal requirements of the NHPA. *Pueblo of Sandia*, 50 F.3d at 860 ("a mere request for information is not necessarily sufficient to constitute the 'reasonable effort' section 106 requires.").

"The NHPA requires an agency to 'stop, look and listen…' [but] the evidence in the present case suggests that Defendants merely paused, glanced, and turned a deaf ear." *Comanche*

26

*Nation*, 2008 WL 4426621 at \*19. For all the reasons above, the Corps' issuance of the Permit failed to meet the requirements of the NHPA and Plaintiffs are likely to succeed on their claims.

B.  Plaintiffs are likely to succeed on their claims under the Thirteenth Amendment

Plaintiffs are likely to succeed on their claim under the Thirteenth Amendment, which abolished slavery and provided the means for abolishing all of its "badges and incidents." *Civil Rights Cases*, 109 U.S. 3, 20 (1883). Like many former plantation sites, this area includes several potential historical and archaeological sites—including almost assuredly the unmarked graves and cemeteries for enslaved people. There has been a long pattern and history of accidental (and sometimes, apparently deliberate) destruction of these gravesites in connection with industrial development in the region of the River Parishes of Louisiana, because of neglect, disrespect, disregard, and repeated failures to fully adhere to applicable laws governing the preservation, protection and treatment of cemeteries. Am. Compl. ¶¶ 40-62.

These unmarked gravesites are the actual, physical, enduring remainder of slavery itself, as the resting places of people who suffered immeasurably in that system. As such, they, and the mistreatment to which they have been subjected historically, are clear and direct "badges and incidents" of slavery, which the Thirteenth Amendment was also intended to abolish. *See Civil Rights Cases*, at 20. Although those buried on the site obviously cannot bring their own Thirteenth Amendment claims, members of the descendant community have brought this suit to address the fate of their ancestors' remains and their own rights to locate, protect, access, and care for the graves.

A federal court in Louisiana has recently ruled that a Thirteenth Amendment claim against a municipality could proceed to address both the impacts of its discriminatory land use system on gravesites of people once enslaved in the parish, as well as the health impacts of its

27

land use decisions on living descendants. *Inclusive Louisiana v. St. James Parish*, No. 23-987, 2026 WL 352793 at *5, *7 (E.D. La. Feb. 9, 2026). Recognizing that the Thirteenth Amendment prohibits more than "the subjection of one man to another" and involuntary servitude, the court observed that the concept of "badges and incidents" has expanded and evolved over time, to include, for instance, racially motivated violence giving rise to the Hate Crimes Prevention Act pursuant to Congress' authority under the Thirteenth Amendment. *Id.* at *4.

The ACHP, which advises federal agencies on compliance with the NHPA, has issued guidance on burial sites, human remains, and funerary objects. Policy Statement on Burial Sites, Human Remains, and Funerary Objects, Advisory Council on Historic Preservation, March 1, 2023 ("Policy Statement").[28] The policy requires that human remains be "treated with dignity and respect in all circumstances." *Id.* Most significantly for this case, the ACHP's policy statement directs agencies to consider the legacies of slavery, which have led to an uneven awareness of where burial sites and human remains are likely to be encountered, and that burial sites of those enslaved are "thus more likely to be affected by development projects." *Id.* at 1. Such cemeteries may be low visibility and difficult to locate using traditional archaeological survey methods. Gray Decl. ¶ 5.

Further, in its explanatory guidance for federal agencies regarding the treatment of burial sites, the ACHP explicitly recognized the harms to descendants of enslaved African Americans who "continue to experience the impacts of intergenerational trauma resulting from the legacies" of enslavement  and that "[d]isturbing the burial areas or remains of ancestors or family members can have traumatic and compounding effects to the social and emotional welfare of

---

[28] Available at: https://www.achp.gov/sites/default/files/policies/2023-07/PolicyStatementonBurialSitesHumanRemainsandFuneraryObjects30June2023.pdf

associated individuals and communities…" Policy Statement Regarding Burial Sites, Human Remains, and Funerary Objects: Explanations and Discussion at 12.[29] Indeed, the exact locations of the graves of people enslaved are unknown precisely because their deaths and graves were unrecorded because they were supposed to be forgotten – a form of intentional neglect and disregard replicated in the Corps' actions today. In light of the specific context of slavery in the River Parishes in Louisiana, any cultural resource investigation of lands occupied by a historic plantation should make the locating of cemeteries a primary concern. Gray Decl. ¶ 4. The Thirteenth Amendment requires that the Corps make locating and protecting these gravesites of people enslaved in this country, that are known to exist, in consultation with descendants, an affirmative duty and priority in its permitting process. Permitting facilities without doing so results in a violation of the Thirteenth Amendment, and constitutional, mental and emotional harm to descendants, in addition to the risk of harm to the cemeteries themselves.

## II.      Plaintiffs are likely to suffer irreparable harm in the absence of relief

A plaintiff shows irreparable harm where "(1) the harm is certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm; and (2) that the harm is beyond remediation." *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 301 (D.D.C. 2020) (quoting *League of Women Voters v. Newby,* 838 F.3d 1, 7–8 (D.C. Cir. 2016)). Plaintiffs  satisfy this because (1) the deliberate erasure of the locations of these burial sites is the direct product of slavery, and the Corps' failure to adhere to the NHPA requirements that could rectify this is a violation of the Thirteenth Amendment; (2) the Permit authorizes ground-disturbing activities that would almost certainly

---

[29] Available at: https://www.achp.gov/sites/default/files/2025-02/BurialPolicyExplanationandDiscussionGuidanceDocumentFeb2025.pdf

disturb or destroy any unmarked burials, in violation of Plaintiffs' constitutional rights; and (3)

Plaintiffs have no other form of remediation.

A.  The Corps' issuance of the Permit in violation of the requirements of the NHPA violates Plaintiffs' constitutional rights under the Thirteenth Amendment

"It has long been established that the loss of constitutional freedoms, 'for even minimal

periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304,

1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). In

*Mills*, the appellate court held that Plaintiffs had shown irreparable injury to their right to drive

upon the public streets as a result of a threatened (and not then-existing) checkpoint. Here,

Plaintiffs are already suffering irreparable harm because the Corps' disregard of their rights and

concerns for the sanctity of their ancestors' gravesites violates their Thirteenth Amendment

rights to be free from the "badges or incidents of slavery." *See* Collins Decl. ¶¶18, 40.

The Corps' violation of Plaintiffs rights under the NHPA cannot be separated from the

context of the centuries-long history of slavery from which Plaintiffs' concerns with this permit

action originate. "The right to consultation under the NHPA does not exist in a vacuum, but

rather, exists as a means to respect and effectuate" Plaintiffs' rights under the Thirteenth

Amendment here. *See Federated Indians of Graton Rancheria v. Haaland*, 762 F. Supp. 3d 888,

895 (N.D. Cal. 2025) (noting failure to consult had real consequence in "effects on Plaintiff's

sacred cultural artifacts and ancestral remains that will be overlooked as a result of being shut out

of the decisionmaking process"). In their response to Plaintiffs' Motion for TRO, Defendants

asserted that Plaintiffs failed to meet their burden of showing irreparable harm, because Plaintiffs

acknowledged that the "potential for unmarked burials" is "unresolved," and thus could not show

that any "alleged ground-breaking activities would disturb unmarked graves or artifacts on the

site." ECF No. 23 at 6. Defendants' argument misses the point entirely.

Plaintiffs' inability to determine the precise location of their ancestral burial grounds is itself a direct, intentional outgrowth and enduring harm of the slavery system, and the precise reason that this case implicates Plaintiffs' constitutional rights under the Thirteenth Amendment. As explained in the Amended Complaint ¶ 30, the State of Louisiana passed numerous laws, both during and after slavery, that were expressly intended to forbid the people enslaved on these plantations from gathering to engage in religious and spiritual practices at these burial sites to honor, pray, and pay their respects to their ancestors.[30] Immediately after the end of the Civil War and the passage of the Thirteenth Amendment, Louisiana established the Black Codes of 1865, which, as former Louisiana Governor Michael Hahn stated in 1866, had the naked intent of "keep[ing] up a sort of slavery in spite of the new constitutional amendment."[31] The third act of these codes, which putatively outlawed "trespassing" on plantations, was "intended to prevent freedmen from leaving the plantations on which they are employed, and from visiting each other…" *Id.* The inability to freely access the former plantation land continues to this day and has prevented descendants from being able to locate and freely access the burial grounds of enslaved ancestors.

In short: *the goal was erasure*. The matter before this Court cannot be separated from this centuries-long history, and the Corps cannot ignore the fact that the "unresolved" question of the

---

[30] 1724 Code Noir, Art. XVI, https://www.loc.gov/item/2021667007 (translation available: https://www.nps.gov/articles/000/transcription-of-the-code-noir-the-black-code.htm) (Prohibiting the "gather[ing] in crowds either by day or by night, under the pretext of a wedding, or for any other cause" of "slaves belonging to different masters."); 1806 Black Code of Louisiana, § 12 (June 7, 1806) https://www.accessible-archives.com/2011/08/the-black-code-of-louisiana-1806 (Prohibiting any slaveowner from "suffer[ing] [on his plantation] other assemblies than that of his own slaves…").

[31] Letter from Michael Hahn to Hon. T. O. Howe, Ex-governor Hahn on Louisiana Legislation Relating to Freedmen, pg. 2, Libr. of Cong. (Apr. 12, 1866), https://archive.org/details/exgovernorhahnon00hahn/page/2/mode/2up?q=intended+; *see also*, Du Bois, supra note 6, at 168.

location of unmarked burials on this site (like all former plantations in the River Parishes) is the direct product of those attempts to intentionally isolate enslaved Africans by severing them from all familial, generational, and cultural ties. This painful history is precisely why the ACHP has recognized that burial sites of formerly enslaved Africans have a significantly "higher probability of being unmarked and undocumented and thus more likely to be affected by development projects," and instructs that disturbance "should not be pursued unless there are *no other alternatives available* and *only after consultation with descendants* or … [associated communities] and fully considered avoidance of impact and preservation in place."7F[32]

Though the intended erasure of this knowledge can never be undone, the Corps is required to at least grant some belated redress through the Section 106 process—and a lack of information about potential prospective harms is itself one of the harms that procedural statutes, such as the NHPA, are intended to prevent. The National Environmental Policy Act ("NEPA") provides a helpful analogue: "Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Likewise, the NHPA consultation process is meant to inform the Corps about potential harms to the gravesites and to Plaintiffs' interests in them. The Corps' violation of the NHPA is especially harmful given that there is a repeated history of both negligent and apparently intentional destruction of unmarked cemeteries in the River Parishes, Am. Compl. ¶¶ 40-62.

Under the NHPA, it is the government's obligation to assume responsibility for the preservation of the Nation's historic properties. *See generally* 54 U.S.C. § 300101 (stating "[i]t is the policy of the Federal Government to contribute to the preservation of nonfederally owned

---

[32]ACHP Burial Sites Policy Statement at 1-2 (emphasis added).

historic property"). Unlike Defendants, Plaintiffs have no ability to access the land in question and cannot require CFI to conduct the surveys that would be necessary to adequately locate and identify unmarked gravesites. Plaintiffs' participation as a consulting party in the Corps' Section 106 process is the *only* means through which they can protect their interests, but the Corps has failed to consult with Plaintiffs. For the Government to, on one hand, argue that Plaintiffs cannot demonstrate harm because the potential for unmarked burials is "unresolved," while simultaneously denying Plaintiffs' request that the Government require CFI to take the reasonable measures that would be necessary to resolve this question, is untenable. The Government cannot have it both ways. To the extent that the potential for unmarked burials remains "unresolved," it is because the Corps has failed to comply with the law.

It is the Corps' obligation under the APA to demonstrate that it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (1983) (agency action is arbitrary and capricious "if the agency has… entirely failed to consider an important aspect of the problem"). It has not done so here.

B.  <u>The Permit authorizes ground-disturbing activities that will disturb or destroy any unmarked burials.</u>

In addition to the irreparable harm stemming from the Corps' disregard of Plaintiffs' rights under the NHPA, the unlawful issuance of the Permit is likely to irreparably harm Plaintiffs further because the permit authorizes significant construction activities in the designated 944-acre permit area, which are necessary for the construction of the ammonia plant and related structures and which will disturb or destroy any unmarked burial sites. This includes the construction of a heavy haul dock and road, which will allow CFI to transport very large and/or heavy ammonia plant components to the project site via barge and is crucial to the

33

construction on the rest of the site—activities that the permit will effectively allow, even if they are not expressly identified in the permit. For example, in addition to the construction activities identified in the permit, CFI has recently proposed to construct interconnecting access roads and parking areas, excavations for storm water management, and "bathtub" excavations (which refers to digging deep holes that go below the water table and are enclosed by walls to keep water out)—all activities that will disturb or destroy any unmarked burial sites. Ex. 13, LDEQ Concurrence Letter (June 16, 2026) at 2.[33]

1. *The Permit authorizes significant construction activities throughout the entire permit area*

The Permit effectively authorizes significant construction activities throughout the designated 944-acre permit area, which could not as a practical matter proceed without this permit. This is precisely why the Corps' own regulations recognize that the appropriate "permit area" for the scope of review under Section 106 is the entire 944-acre project area. Under the Corps' regulations, the "permit area" that must be included in the scope of a Section 106 review includes **both** those areas comprising the waters of the United States that will be directly affected by the proposed work or structures **and** uplands directly affected as a result of authorizing the work or structures. 33 C.F.R. § 325, App. C(1)(g)(1). Three tests are required for activities outside of waters of the United States to be included within the "permit area:"

1.  Such activity would not occur but for the authorization of the work or structures within the waters of the United States;

2.  Such activity must be integrally related to the work or structures to be authorized within waters of the United States. Or, conversely, the work or structures to be authorized must be essential to the completeness of the overall project or program; and;

---

[33] Because the requirements of Section 106 only apply to federal agencies, there is no Section 106 review process for the air permits discussed in the LDEQ Concurrence Letter.

34

3. Such activity must be directly associated (first order impact) with the work or structures to be authorized.

33 C.F.R. § 325, App. C(1)(g)(1)(i)-(iii).

The Corps' regulations provide a helpful example of an application for a permit to construct a pier and dredge an access channel so that an industry may be established and operated on an upland area. In the example, if the industry requires the access channel and the pier and without such channel and pier the project would not be feasible, the industrial site, even though upland, would be within the "permit area." 33 C.F.R. § 325, App. C(1)(g)(2)(i).

The portion of the CF Industries project that is sited in waters of the United States, and that requires CWA 404 and RHA 408 permitting, includes a marine terminal and a heavy haul road.[34] The permit allows it to "[c]lear, grade, and deposit fill and dredge Mississippi River waterbottoms for the construction of an ammonia manufacturing facility including a marine terminal, pipe rack, and heavy haul road. Permit at 1. Application of the three tests above shows that the entire construction site is properly within the permit area. First, the ground-disturbing activities described above—both those explicitly identified in the Permit and those that will occur because of the Permit—could not occur in the permit area absent the issuance of the permit allowing CF to build the marine terminal and heavy haul road. Second, the marine terminal and heavy haul road are essential to the completeness of the overall project or program. Third,

---

[34] The most significant authorization under the wetland permit is the construction of the heavy haul dock/road, which crosses over the Mississippi River levee and LA-405 (River Road). This heavy haul dock and road will allow CFI to transport very large and/or heavy ammonia plant components to the project site via barge. It is very unlikely that CFI could transport this equipment in via LA-405, which is only a two-lane rural road and is very unlikely to be structurally capable of handling such loads, given the excessive wear reported from dump trucks driving to and from the site and the numerous accidents involving overturned dump trucks. *See* Am. Compl. ¶ 120, Photos 5-7. As such, this heavy haul road is key to the construction of the ammonia plant, and the construction on the rest of the site could not proceed without it.

35

construction of the ammonia plant is directly associated with the marine terminal and heavy haul road. The marine terminal and heavy haul road are being built for the express purpose of serving the ammonia plant, and these construction activities could not proceed without them.

The instant case is indistinguishable from the example provided in the regulations. The example was of a pier and access channel. Here, we have a marine terminal and heavy haul road. In both cases, the industrial facility to be established and operated upland is within the project area because it would be established but for the work in waters of the United States, the projects are integrally related and directly associated with the project work in waters of the United States. *See* 33 C.F.R. § 325, App. C(1)(g)(2)(i). Thus, in both cases, the upland industrial site is part of the "permit area."

Although the Corps did not provide an analysis for what comprised the permit area, it acknowledges in both its No Effects Determination and Statement of Basis that the permit area encompasses the whole 944-acre project site, and its Statement of Basis expressly cites the same three-factor analysis applied above. Ex. 2, Statement of Basis at 3 (citing 33 C.F.R. § 325, App. C(1)(g)(1)(i)-(iii)); Ex. 6, Final Determination at 1. Defendants have determined, applying their own regulations, that the activities authorized by the Permit and the upland construction activities are inextricably linked. Thus, the Permit effectively authorizes the construction activities throughout the rest of the designated 944-acre permit area, and with the permit now in CF Industries' hands, the potential harm to unmarked burial sites is imminent.

**Figure 3** Project plan view showing heavy haul dock/road (outlined in red). Original figure from final permit, Ex. 1 at 22).

36



2. *Previous work was limited but is now fully authorized*

Since mid-to-late March of 2026, after the Corps issued its Final Determination of "no adverse effects" to cultural resources, CFI began conducting construction preparation activities on the site, including heavy grading, trenching, digging, paving, equipment staging (including heavy construction vehicles such as bulldozers and cranes). Am. Compl. ¶¶ 120-21; Collins Decl. ¶¶ 21-24, 39. Dr. Gray notes that "[a]ny ground-disturbing activities on the site… puts unmarked graves at risk of damage and destruction," including site grading and equipment staging in particular, which "may compromise the integrity of archaeological sites and irreparably harm historic properties like cemeteries." Gray Decl. ¶ 15. These activities are directly tied to the permit, because CFI could not have undertaken such ground-disturbing activities **anywhere** on the project site absent the Corps' "no adverse effects" determination.

37

Ground-disturbing activities that are directly related to the project, are within the APE, and which have the potential to affect historic properties simply could not proceed without the Corps' finding of no adverse effect—and it is notable that CFI intensified and expanded these activities shortly after the Corps issued its "no effects" determination in March. Had the Corps determined that the project **would** have an adverse effect on a historic property, or requested that CFI take additional measures to identify potential unmarked burials in the APE, CFI could not have proceeded with any ground-disturbing activities in the APE until these concerns were addressed.[35]

In addition to the river (battur) side of the levee, there are jurisdictional non-wetland waters on the land side of the levee that will be either temporarily or permanently impacted. Permit at 24, Figure 4. In other words, CFI has had to avoid impacting (e.g., filling in) these areas on the land side of the levee until it got its permit. Now with the permit in hand, CFI can fully proceed with the construction throughout the site that it has been preparing for, with equipment in place. Although it has already risked harm to unmarked graves with its staging and preparation activities using heavy equipment, now that construction throughout the full site is permitted, construction can begin in earnest, heightening the risk of damage to any unmarked graves to a near certainty.

This harm is imminent and actual, and not theoretical. Although the precise location of any unmarked cemeteries is not known, the land is well known to contain unmarked graves of people enslaved on the plantations that once operated there. Gray Decl. ¶¶ 4-5, 7. CFI plans a large, industrial facility and marine terminal requiring extensive disturbance of most of the site.

---

[35] Similarly, Special Condition 8 of the final permit, which instructs CFI to "stop work immediately" in the event that any unmarked graves are discovered, further shows that the Corps can and does exercise jurisdiction over the site.

Construction preparation and staging, which also risk damage to graves, is already underway. *See* Am. Compl. ¶ 120, Photos 2-5; Collins Decl. ¶¶ 22-24. If a structure is built directly on top of an unmarked burial, it would effectively remove the possibility of future discovery of its precise location. Further, construction throughout the site using heavy machinery puts unmarked graves and human remains at risk of damage and destruction, Gray Decl., ¶ 14, which, as noted above, is serious and irreparable harm.

      3.   *Harm is imminent and irreparable*

The D.C. Circuit has stated a movant may establish imminence by "provid[ing] proof that the harm has occurred in the past and is likely to occur again." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 47 (D.D.C. 2020). The repeated destruction of unmarked cemeteries in the River Parishes is evidence that without adequate identification and protection measures, the destruction of another unmarked cemetery is extremely likely. *See Se. Fisheries Ass'n, Inc. v. Lutnick*, No. CV 26-1533 (RC), 2026 WL 1430499, at *11 (D.D.C. May 21, 2026) (holding plaintiffs met their burden to establish a likelihood of irreparable harm by submitting evidence that overfishing had repeatedly delayed efforts in the past to rebuild fish populations despite existing restrictions and that extended fishing permits were likely to result in overfishing, thus demonstrating "a credible risk" that the extending permits would further delay stock rebuilding). The existence of applicable laws and rules requiring protection of gravesites and human remains that the Corps relies on here (such as when it requires CFI to "stop work immediately and comply with the Louisiana Unmarked Human Burial Sites Preservation Act") have not prevented the destruction of other graves elsewhere in the River Parishes. By the time a grave is inadvertently discovered, it is typically too late, as it has inherently already been disturbed or destroyed.

C.  Plaintiffs have no other form of remediation

As noted above, this is not a case where the harm can be fixed later. *See Female Union Band Ass'n v. Unknown Heirs at Law*, 403 F. Supp. 540, 540-49 (D.D.C. 1975) (vacating prior court order allowing the disinterment of bodies from a historically black graveyard; stating "the violation of their graves involves the destruction of a monument to evolving free Black culture"); *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.,* CV 25-4316 (RJL), 2026 WL 877779, at *15 (D.D.C. Mar. 31, 2026), *opinion clarified sub nom. Nat'l Tr. for Historic Pres. in United States v. Nat'l Park Serv.,* CV 25-4316 (RJL), 2026 WL 1027744 (D.D.C. Apr. 16, 2026) (aesthetic and environmental injuries are often irreparable since they are seldom remedied by money damages and are often permanent or last a long time); *US v. Jenkins*, 714 F. Supp. 2d 1213, 1222 (S.D. Ga. 2008) (granting preliminary injunction while holding "artifacts are, by their nature, unique, and their historical and cultural significance make them difficult to value monetarily").

Plaintiffs have no other form of remediation. Considering potential harm to historic burial and cultural sites, the U.S. District Court for the District of Columbia, and other federal district courts, consistently hold there is seldom another avenue of redress, aside from an emergency injunction. *See, e.g., Nat'l Trust,* 2026 WL 877779, at *14-15 (collecting cases). Once a grave has been disturbed or damaged, it cannot be undisturbed or undamaged, and no amount of monetary compensation can fully redress the profound cultural and spiritual harms that result.

III.    **The balance of equities and the public interest favor granting preliminary injunction.**

The balance of equities favors the Plaintiffs. On Plaintiffs' side is respect for burial sites of persons who were enslaved in this country and the multiple impacts of harm to those graves on Plaintiffs, as part of the community of their descendants, including constitutional, legal, mental, emotional, psychological, and social. *See* Collins Decl. ¶¶ 7-8, 10-15, 18, 31, 40. On the

40

other is a temporary pause in the Army Corps' rushed permitting process and the business plans of an ammonia producing company. If an injunction is not granted, the harms to Plaintiffs' constitutional and legal rights will be compounded and harm to burial sites could be permanent and irreparable. These harms and risks outweigh any harm to the Corps or to CF Industries caused by the temporary delay until the merits of Plaintiffs' claims can be resolved.

The court in *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014), recognized that the balance of equities between the irreparable environmental harms caused by logging mature trees and the economic interest in the project tipped toward the environmental harms because those harms are permanent. Likewise, any harm to the Corps' and/or CF Industries is only a temporary delay, and the Corps cannot claim to be harmed by being required to follow the law. But if human remains are disturbed or damaged, that harm is permanent. The temporary harm to economic interests seeking a permit to develop the land does not outweigh the permanent harm to the burial sites it contains. *See also Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1121 (S.D. Cal. 2010) (equities favor tribe seeking injunction to protect historic sites even where solar energy developer already spent millions preparing for project and faces difficulties obtaining investment and financing if the project is held up).

At the press conference hosted by Secretary Rollins, she asserted that the purported basis for expediting the Corps' permitting process for CF Industries was to increase the supply of ammonia for fertilizer for American farmers which had been reduced as a result of the United States' war with Iran.[36] However, both Secretary Rollins and other agency officials who spoke failed to acknowledge that the majority of the ammonia that would be produced at the facility

---

[36] USDA Press Conference, *supra* n. 12.

would be shipped overseas for use as fuel for a power plant and steel factory by CF Industries' two Japanese corporate partners.[37][38] They also failed to mention that the facility was expected to start operations in 2029 at the earliest,[39] so even if the ammonia were intended for domestic use it would not address the immediate needs of American farmers.

Consideration of the public interest also favors an injunction. In amending the NHPA, Congress stated that "the preservation of [the Nation's] irreplaceable heritage is in the public interest." NHPA of 1966, Pub. L. No. 89-665, *amended by* National Historic Preservation Act Amendments of 1980, Pub. L. No. 96-515. Further, the public has an interest in agencies complying with the law. *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998). All aspects of balancing the equities and the public interest favor an injunction to maintain the status quo and prevent harm to unmarked graves until the merits of Plaintiffs' claims can be decided.

### IV.    The Court should waive the bond or set a nominal bond of $1.00.

Rule 65(c) of the Federal Rules of Civil Procedure requires a movant seeking a preliminary injunction to provide "security in an amount that the court considers proper" to pay costs and damages sustained by any party found to have been wrongfully enjoined.

While injunction bonds are "generally required," *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), the D.C. Circuit has long recognized that Rule 65(c) "vest[s] broad discretion in the district court" in setting the amount of

---

[37] *See* CFI, SEC Quarterly Form 10-Q for 1Q 2026 (stating Blue Point products "are expected to be used for existing and new applications, such as power generation and steel production in Japan"). Available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001324404/000132440426000013/cf-20260331.htm#fact-identifier-624
[38] JERA Co., Press Release (Apr. 9, 2025)(stating Japanese partners' share of Blue Point is 60%). Available at: https://www.jera.co.jp/en/news/information/20250409_2155
[39] *Id.*

such bond, and this includes the discretion to set it at a nominal amount. *DSE*, 169 F.3d at 33. When determining whether to waive a bond or set it to a nominal amount, courts consider factors such as a plaintiff's limited financial means and risk of a bond foreclosing judicial review, the public interest character of the litigation, the minimal or non-existent risk of harm to defendant, and a strong likelihood of success on the merits. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025). All of these factors weigh strongly in favor of waiving a bond requirement, or setting at most a nominal bond, here.

"Courts in both this Circuit and others have widely found that it is generally inappropriate to impose a bond where requiring a bond 'would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025). This is especially the case in public interest litigation. *See, e.g.*, *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (courts have frequently declined to require bonds in public interest litigation because imposing a bond runs the risk of "unduly burden[ing] plaintiffs and potentially impair[ing] their ability to seek relief."). Finally, courts in this Circuit have routinely required only nominal bonds from parties seeking preliminary relief against federal officers and agencies where the awarded relief will not impose an undue or significant burden. *See, e.g.*, *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025) (setting nominal bond of $1.00 in APA challenge); *CREW v. U.S. DOJ*, No. CV 25-4426 (CKK), 2026 WL 472589, at *14 (D.D.C. Feb. 19, 2026) (setting nominal bond of $100 in FOIA challenge); *Se. Fisheries* at *13 (setting nominal bond of $100 in APA challenge to issuances of permits); *accord NRDC v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) ("The Court believes that the public interest will be far more gravely damaged by failure of the courts to rigorously and consistently enforce [the National

Environmental Protection Act] than by any harm which could possibly result from delaying this lease sale long enough to resolve the important legal issues presented by this suit.").

As a local nonprofit organization and community church composed of long-time residents of Modeste and Ascension Parish, many of whom are descendants of people formerly enslaved on the nearby plantations and who continue to be marginalized by the State of Louisiana under the continued legacy of the slavery system, Plaintiffs possess limited financial resources and cannot pay a substantial bond.

Plaintiffs' lawsuit plainly serves the public interest. Plaintiffs bring this case to protect both the public interest in ensuring that the government respects constitutional rights and observes the important minimum procedures required to ensure that it has properly evaluated the potential impact of federal undertakings to historic sites of profound cultural, spiritual, and religious significance, as well as Plaintiffs' own rights under the United States Constitution.

Finally, given the serious legal and constitutional issues arising from Defendants' conduct and the lack of any harm to Defendants that could result from temporarily suspending the permit, there is no risk of any undue or significant harm to Defendants in granting a preliminary injunction. Requiring any more than a nominal bond would serve no purpose, contradict the requirements of justice, and considerably compound the harms already faced by Plaintiffs in this matter.

## CONCLUSION

The Corps has issued the final Permit in violation of the requirements of the NHPA and Plaintiffs' constitutional rights under the Thirteenth Amendment. Consequently, the Corps' decision to issue the final Permit is unlawful under the Administrative Procedure Act, and if it is allowed to stand, Plaintiffs will continue to suffer irreparable harm to their constitutional rights,

44

and are very likely to suffer additional irreparable harm as a result of construction allowed by the Corps. For all the above reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction and issue an order suspending the Permit, and the underlying determination of No Adverse Effects so that the status quo may be temporarily preserved pending resolution of this litigation on the merits.

Dated: July 21, 2026

William P. Quigley**
Professor Emeritus of Law
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel. (504) 710-3074
Fax (504) 861-5440
quigley77@gmail.com

Respectfully submitted,

*s/ Sanghyun Lee*
Sanghyun Lee, DC Bar No. 1632212
Jennifer Duggan, DC Bar No. 978352
Lauren Grady,* DC Bar application pending
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, DC 20006
Telephone: (202) 263-4441
SLee@environmentalintegrity.org
jduggan@environmentalintegrity.org
lgrady@environmentalintegrity.org

Astha Sharma Pokharel*
Kayla Vinson*
Celine Zhu*
Pamela C. Spees*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel. (212) 614-6431
Fax (212) 614-6499
astha.sharmapokharel@ccrjustice.org
kvinson@ccrjustice.org
czhu@ccrjustice.org
pspees@ccrjustice.org

Counsel for Plaintiffs

*admitted pro hac vice
**pro hac vice application forthcoming

45